UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JOYCE L. PARKS,

        Plaintiff,

v.                                    Case No.  5:07-cv-504-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

        Defendant.
_____/

## ORDER

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits. (Doc. 1.)  The Commissioner has answered (Doc. 8) and both parties have filed briefs outlining their respective positions. (Docs. 11 & 15.)  For the reasons discussed below the Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

On March 18, 2008, Plaintiff filed an application for a period of disability and disability insurance benefits claiming a disability onset date of August 5, 2002.  (R. 87-89.)  On December 15, 2006, Plaintiff's claim was denied after a hearing before an Administrative Law Judge ("ALJ") (R. 19-26, 267-294.)  On October 17, 2007, the Appeals Council denied Plaintiff's request for review.  (R. 3-5.)  After having exhausted her administrative remedies, Plaintiff sought judicial review pursuant to 42 U.S.C. § 405(g) and filed her appeal to this Court. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1]  Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3]  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

[5] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, she is not disabled.[9]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10]  Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, she is disabled.[11]  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12]  Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age,

---

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *See* Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] Id. § 404.1520(c).

[11] Id. § 404.1520(d).

[12] Id. § 404.1520(e).

education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15]  The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are

---

[13] Id. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[16] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987) ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## III. <u>SUMMARY OF THE RECORD EVIDENCE</u>

Plaintiff was born on May 1, 1959 and was forty-seven (47) years old at the time her insured status expired and at the time of the ALJ's decision.  (R. 67, 72, 87-89.) Plaintiff has a tenth grade education and past relevant work experience as a cashier. (R. 92-93, 95, 100-107.)  Plaintiff contends that she has been unable to work since August 5, 2002, due to a back injury and asthma.  (R. 91.) Plaintiff complained of severe low back pain radiating down into her legs which causes her to fall, an inability to stand for prolonged periods of time, and poor sleep.  (R. 91, 108, 111, 118.) The ALJ determined that Plaintiff has the severe impairments of degenerative disc disease of the lumbar spine and morbid obesity.  (R. 21.)  The ALJ found that Plaintiff had the residual

---

[18] <u>Walker</u>, 826 F.2d at 1003.

[19] <u>Wolfe v. Chater</u>, 86 F.3d 1072, 1077-78 (11th Cir. 1996).

[20] *See* <u>id</u>.

[21] *See* <u>Doughty v. Apfel</u>, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

functional capacity ("RFC") to lift twenty pounds; to stand, walk and sit for six hours in an eight-hour workday; postural limitations in climbing, balancing, stooping, kneeling, crouching and crawling; and that she should avoid fumes, odors, gases, poor ventilation, unprotected heights and moving machinery. (R. 21.) The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work, including her past relevant work as a cashier and therefore was not disabled. (R. 26.)

Plaintiff was treated by Dr. Richard Gray from June 2001 through June 2002 for a work related injury which caused back pain. (R. 163-164.) According to the Plaintiff, she rated her pain at a 5, on a 0 to 10 scale and denied that it radiated to her arms and legs. (R. 162.) A physical examination revealed that Plaintiff ambulates with a slightly flexed position and an antalgic gait; however, she did not use an assistive device. (R. 163.) Plaintiff was unable to stand erect and lists to the right but was able to climb off of the table without assistance. Plaintiff was able to stand erect but does experience pain with bending; she can sit at 90 degrees, has intact deep tendon reflexes. Dr. Gray reviewed the radiographs and determined that there was normal alignment and the disc spaces were well maintained. Outside x-rays revealed minimal degenerative disc changes with no other abnormalities. Dr. Gray determined that Plaintiff could return to work with restrictions and she should limit her lifting.

On July 19, 2001, Plaintiff returned for treatment with Dr. Gray and stated that she did "feel somewhat better." (R. 161.) Dr. Gray reviewed the MRI results which revealed some mild disc changes, but no arthritis, no herniations, no stenosis or foraminal impingement. During her physical examination, Dr. Gray noted that Plaintiff could move on and off the table more easily, her lower extremity reflexes were intact,

and no clubbing cyanosis, edema, cellulitis, lymphangitis, or adenopathy was noted. Plaintiff had a negative straight leg raise for leg pain, no atrophy of the lower extremities, normal motor strength and she ambulated with a non-antalgic gait and no assistive device. Dr. Gray recommended physical therapy and stated that she may return to work.

On October 25, 2001, Plaintiff returned to Dr. Gray for her low back pain. (R. 158.) Plaintiff complained of persistent back pain and burning. However, she denied numbness, tingling, and paresthesias radiating down the leg. Upon physical examination, Dr. Gray found that she was not in acute distress and sat comfortably at 90 degrees. Dr. Gray noted that Plaintiff ambulated without assistance and climbed on and off the exam table without difficulty. Plaintiff complained of pain to palpitation but did not have costovertebral tenderness, spasms, mass, listing, deformity or radicular symptoms. Plaintiff exhibited full range of motion of her upper extremities.

Plaintiff was seen by Dr. Gray on November 27, 2001. (R. 157.) At this time, Dr. Gray noted that Plaintiff was morbidly obese and had limited range of motion due to her size and back pain. Dr. Gray noted that she had a negative straight leg raise, intact deep tendon reflexes, no atrophy of the calf or thigh, normal sensation and motor power in flexion and extension. Although Plaintiff reported her back pain was unchanged, she had no radicular or nerve symptoms and full range of motion of her upper extremities. Dr. Gray noted that Plaintiff was working with restrictions.

During her appointment on January 8, 2002, Dr. Gray noted that Plaintiff had a disc herniation at L4-5 which had responded to conservative measures. Specifically, Plaintiff received quite a bit of relief with the use of a TENS unit in therapy. (R. 156.)

7

Dr. Gray noted that Plaintiff had full range of motion of the cervical spine, her upper and lower extremities were neurovascularly in tact and she was not having much radicular symptoms. Dr. Gray noted that Plaintiff was back at work with light duty restrictions.

On June 13, 2002, Plaintiff returned to Dr. Gray still complaining of low back pain and pain in the left and right buttock. (R. 154.) Dr. Gray noted that Plaintiff was treated with epidural injections without improvement. A physical examination revealed a limitation with forward flexion/extension of the spine which Dr. Gray noted was "probably as much obesity as anything else." Plaintiff exhibited good rotation, intact tendon reflexes, and had difficulty climbing on and off the table. Plaintiff did not use an assistive device for ambulation and had full range of motion of the lower extremities, hip, knee, ankle, mid-foot and toes. Dr. Gray recommended a surgical evaluation and opined that she was temporarily disabled. (R. 155.)

Then, on June 18, 2002, Plaintiff was examined again by Dr. Gray who noted that Plaintiff was in no apparent distress. (R. 153.) Plaintiff exhibited limited range of motion of the spine, but did not experience spasms, mass, listing, or deformity. Plaintiff had full range of motion of the bilateral lower extremities and no clubbing, cyanosis or edema. Dr. Gray noted that Plaintiff still had some tenderness in her back but her deep tendon reflexes were intact. Dr. Gray referred Plaintiff for a surgical evaluation and stated that she could return to work with restrictions.

On May 12, 2002, Dr. Edward Demmi conducted a consultative examination of Plaintiff. (R. 171-175.) Plaintiff complained of chronic low back pain, asthma, high blood pressure and morbid obesity. (R. 171-172.) Plaintiff reported that she had undergone a weight loss program the previous summer and had lost almost 100

pounds. (R. 172.) Plaintiff weighed 285 pounds at this appointment. Plaintiff had a normal range of motion of the cervical spine and her motor and sensory findings were normal. (R. 173-75.) Plaintiff exhibited a decreased range of motion of the lumbar spine on flexion forward to 15 degrees with Plaintiff stopping due to pain in the mid-lumbar area radiating down into the right buttocks area. (R. 174.) Plaintiff had moderate tenderness to palpation in the lower lumbar region bilaterally. Plaintiff had a slightly antalgic gait to the right with a limp; however, she did not use an assistive device. Plaintiff exhibited normal grip strength and fine manipulation and did not have any motor deficits in the upper or lower extremities. An examination of Plaintiff's major joints revealed no deformity, redness, heat, swelling, pain, tenderness, or other signs of inflammation. (R. 175.) Dr. Demmi also stated that Plaintiff had reproducible fatigue with any type of motion, mostly due to her obesity. (R. 175.)

An MRI of Plaintiff's lumbar spine conducted on June 28, 2002 revealed that Plaintiff had broad based disc bulging at L4-5. (R. 170.) Minor degeneration at L5-S1 was also noted.

Plaintiff was evaluated by Dr. M. Allam Reheem, a pain specialist, in October of 2002 for complaints of low back and right leg pain. (R. 226-227.) The records disclose that Plaintiff weighed 352 pounds at that time. (R. 226.) The physical examination revealed that Plaintiff had decreased range of motion of the lumbar spine. However, Dr. Reheem noted that her strength was a 5/5 and equal with no focal deficits and her sensory was intact. Dr. Reheem diagnosed lumbar disc disease, prescribed Vicoden and referred Plaintiff for a neurosurgical consultation.

Plaintiff was treated by Dr. Barry Kaplan, a neurosurgeon from June 28, 2002 to February 4, 2003 (R. 165-170.)  An evaluation on July 25, 2002 revealed that Plaintiff had decreased range of motion and some radiation of pain into her right lower extremities; however, neurologically there was no motor, reflex or sensory abnormality. (R. 169.)  Dr. Kaplan stated that a review of the MRI demonstrated the presence of moderate lateral recess stenosis on the right side at L4-5, with a small disc herniation. Although Dr. Kaplan thought surgery may be an option, he opined that the likelihood of improvement was not good because of her size and chronicity of symptoms.  Dr. Kaplan concluded that Plaintiff was capable of light duty with no lifting greater than 10 pounds and no prolonged bending or stooping.

On October 8, 2002, Plaintiff was seen for a follow up visit with Dr. Kaplan.  (R. 168.)  Plaintiff continued to complain of pain in her back and right leg; however, Dr. Kaplan did not want to perform surgery until Plaintiff reached a weight of 300 pounds. On December 10, 2002, Plaintiff reported to Dr. Kaplan that she had started a weight loss program and her current weight was 343 pounds. (R. 166.) On February 24, 2003, Dr. Kaplan reported that Plaintiff had not started a weight loss program and he could not be of any assistance to her until she did. (R. 165.)  Dr. Kaplan stated that based upon her current condition, he did not know whether or not she would need surgery.  Dr. Kaplan noted that Plaintiff was limited to lifting objects greater than 20 pounds and from prolonged bending or stooping.

After her consultation with Dr. Kaplan in October of 2002, Plaintiff returned to Dr. Reheem for treatment.  (R. 225.)  Plaintiff reported that Dr. Kaplan ordered a weight loss program and that her pain was reasonably well controlled.  In January of 2003,

Plaintiff requested that Dr. Reheem change her medication, because Lortab worked better than the Vicoden she had been taking. (R. 224.) At this appointment, Dr. Reheem noted a decreased range of motion in the lumbar spine. In April of 2003, Plaintiff reported that the Lortab was working much better, but she still experienced quite a bit of pain. (R. 223.) Dr. Reheem increased her Bextra medication and advised Plaintiff to continue to diet. Dr. Reheem noted that Plaintiff was unable to work.

In March of 2003, Plaintiff returned to Dr. Reheem for treatment and stated that her pain was reasonably well controlled. (R. 222.) Dr. Reheem noted that Plaintiff was to continue on the current medication and that she was functional. A physical examination revealed that Plaintiff had decreased range of motion of the lumbar spine. In July of 2003, Plaintiff returned to Dr. Reheem for follow-up treatment and complained of increased pain with a pins and needles sensation in the lumbar area. (R. 221.) Dr. Reheem noted a decreased range of motion of the lumbar spine. Plaintiff reportedly took one or two Lortab tablets per day and was reluctant to take more for fear of becoming addicted to pain medication. In September of 2003, Dr. Reheem reported that Plaintiff continued to be symptomatic with severe low back pain. (R. 219.) At that time, Plaintiff reported that she had a great deal of pain in the morning and had difficulty getting out of bed. However, Plaintiff reported that she had lost an additional eight pounds.

In November of 2003, Plaintiff returned for treatment with Dr. Reheem. (R. 218.) Dr. Reheem noted that Plaintiff was fairly functional but she complained that she had weakness in her left leg which caused her to fall. Dr. Reheem subsequently gave Plaintiff a prescription for a cane. On December 31, 2003, Dr. Reheem noted that

Plaintiff was well maintained on her current medications and that she was functional. (R. 217.) A physical examination revealed normal findings, except Dr. Reheem noted that she had decreased range of motion in the lumbar spine. In February of 2004, Plaintiff continued to lose weight and was down to 313 pounds. (R. 216.) According to Dr. Reheem, Plaintiff was fairly functional even though the physical examination showed a decreased range of motion in the lumbar spine.

In May and July of 2004, Plaintiff returned for follow up treatment with Dr. Reheem. (R. 214-215.) During these appointments, Plaintiff continued to complain of back pain and had decreased range of motion. In July, Plaintiff reported that she had been seen in the emergency room due to a fall and that she had hurt both knees when she fell. (R. 214.) A month later, in August of 2004, Plaintiff reported that she experienced reasonably good pain control with her medications. (R. 213.) Dr. Raheem noted that she is well maintained on the current medication, she is functional and is sleeping fair. Again, he noted a decreased range of motion of the lumbar spine.

Two Residual Functional Capacity Assessment Forms were completed by two reviewing state agency examiners in 2004. (R. 176-183, 194-201.) The reviewing examiners determined that Plaintiff could stand, walk and sit six hours in an 8 hour work day and could lift twenty pounds. (R. 177, 120.) They opined that Plaintiff had occasional limitations with climbing, balancing, stooping, kneeling, crouching and crawling. (R. 178, 196.) Additionally, they concluded that Plaintiff should avoid fumes, odors, dusts, gases and poor ventilation and would should also avoid unprotected heights and moving machinery. (R. 198.)

Plaintiff was treated for knee pain at Ocala Regional Medical Center on June 20, 2004. (R. 184-187.) Dr. Stoner conducted a physical examination and noted that Plaintiff was in a mild amount of distress. (R. 185.) An examination of the knees revealed no obvious deformities, she exhibited good range of motion and there was no crepitus bilaterally. An x-ray of both knees revealed some degenerative changes but nothing acute. Dr. Stoner diagnosed Plaintiff with arthralgias, bilateral knees.

An MRI of the lumbar spine was taken on July 27, 2004. (R. 188, 239.) The MRI revealed a small right posterolateral disk protrusion at L4-5, causing mild right neural foraminal encroachment and a mild posterior disk bulge at L5-S1, multilevel facet hypertrophy.

On September 11, 2004, Plaintiff was treated at Ocala Regional Medical Center for abdominal pain and swelling, the impression was gastritis. (R. 190, 192.) During this examination, Dr. Adkins noted Plaintiff did not have costovertebral or spinous process tenderness in her back and her extremities had no cords, cyanosis or edema. (R. 191.) Dr. Adkins observed that Plaintiff "was obviously in no acute distress." (R. 191.)

Plaintiff returned to Dr. Raheem on October 22, 2004. (R. 212.) Plaintiff complained of numbness in the right knee and arm and stated that she falls frequently due to the pain the right knee and weakness in the right leg. According to the Plaintiff, Dr. Kaplan told her that the disc had disappeared and there was no longer a herniation. Dr. Reheem noted a decreased range of motion to the lumbar spine and changed Plaintiff's medication because the Lortab caused her to itch. In November of 2004, Dr. Reheem noted that the Percocet was working better than the Lortab but that she was

still having problems with urticaria. (R. 211.) During this appointment, the physical examination was normal with the exception that Plaintiff had decreased range of motion.

In January, March, and April of 2005, Dr. Reheem treated Plaintiff for low back pain. According to the treatment notes, Plaintiff's medications controlled the low back pain to a fairly tolerable level. (R. 208-210.) During this period of time, the physical examination was normal, except that Plaintiff continued to have a decreased range of motion. In June of 2005, Plaintiff returned to Dr. Reheem for medication refills and he noted that she was functional and that her pain was fairly controlled with the current medication. (R. 207.) In July, August, September and October of 2005, although Dr. Reheem noted that Plaintiff used a cane and had decreased range of motion of the lumbar spine, he described Plaintiff as fairly functional and noted that her pain was fairly well controlled. (R. 202-04, 206.)

Plaintiff sought treatment from Dr. Jorge Inga in October of 2005 for lumbar and right leg pain. (R. 228-238.) The neurological evaluation showed that Plaintiff walked with a difficult gait, favoring her weight on the right side. (R. 236.) A motor system evaluation revealed good strength tone in all four extremities and there was no evidence of deficits in sensory examination. (R. 236-237.) Dr. Inga noted that there was tenderness on percussion of the lumbar region with reflex spasms and he diagnosed degenerative small right posterolateral protrusion at L4-5 and degenerative bulging at L5-S1. (R. 237.) Dr. Inga opined that the neurological examination failed to disclose evidence of a focal neurological deficit, specifically, no evidence of radiculopathy or myeopathy was present. (R. 238.) Dr. Inga recommended that Plaintiff continue the

same conservative management and stated that Plaintiff was temporarily totally disabled.

In November of 2005, Plaintiff returned to Dr. Reheem for treatment. (R. 259-261.) Plaintiff complained of lumbar pain, right knee numbness, tingling and right arm numbness. Upon examination, Dr. Reheem noted that Plaintiff's back was restricted in all directions. Plaintiff was using a cane and her gait was antalgic and her pain medication was refilled since the current regimen had worked well. (R. 261.)

Plaintiff returned for treatment with Dr. Inga following a December 2005 MRI. (R. 230-232.) The MRI revealed evidence of degeneration and bulging of the disc at L4-5 and L5-S1 centrally located, with no compromise of the neural structure. (R. 230-31.) Dr. Inga noted that the neurological examination revealed tenderness of the paraspinal muscles of the lumbar region with reflex spasm. (R. 231.) Dr. Inga prescribed a lumbar traction device and a lumbosacral corset for Plaintiff and recommended continuation of the same conservative management. Dr. Inga recommended that at 333 pounds, Plaintiff should get enrolled in a strict weight reduction program. Dr. Inga opined that Plaintiff was capable of returning to work with restrictions of no lifting greater than 20 pounds and she should avoid repetitive pushing, pulling, bending or lifting. (R. 232.) Dr. Inga recommended that Plaintiff should be retrained in a position where she can perform only a sedentary type of job. Also, if Plaintiff was sitting down on a continuous basis, Dr. Inga recommended that Plaintiff be allowed to take a break every hour or so.

In December of 2005 and January of 2006, treatment notes from Dr. Reheem reveal that the pain medication controlled Plaintiff's pain at a tolerable level. (R. 248, 251, 254, 255-256.) Dr. Reheem concluded that Plaintiff had low back pain and

15

lumbosacral radiculitis.  Upon examination, Dr. Reheem noted that Plaintiff's back was restricted in all directions, her gait was antalgic and she used a cane.  Plaintiff's pain medication was refilled since the current regimen worked well.  (R. 252.)  Plaintiff complained that she had decreased activities of daily living because of the pain. According to Dr. Reheem, since Plaintiff was not a surgical candidate, he would recommend epidural blocks.  (R. 248, 250-251.)

In February of 2006, Plaintiff returned for treatment from Dr. Inga.  (R. 228-229.) During that appointment, her neurological examination was unchanged.  Dr. Inga opined that Plaintiff could return to work with restrictions of not lifting anything heavier than 20 pounds and she should avoid repetitive pushing, pulling, bending or lifting.  Dr. Inga suggested that Plaintiff be retrained in a position where she could perform a sedentary type of job.

In August of 2006, Plaintiff was treated for back pain with Dr. Reheem.  (R. 247.) According to Plaintiff she was sleeping irregularly and her activities of daily living were decreased due to the pain.  Dr. Reheem noted that Plaintiff had a decreased range of motion in the lumbar spine and an antalgic gait.

 On September 8, 2006, Dr. Reheem completed a medical verification form and stated that Plaintiff had degenerative disc disease with herniation in the lumbar spine. (R. 263.)  Dr. Reheem opined that Plaintiff was unable to work and that she was limited in walking, sitting and any other activities.   (R. 262-263.)  In an undated form completed by Dr. Reheem, he noted that Plaintiff had physical limitations in lifting, bending, and reaching.  (R. 262.)

Plaintiff was treated by the Marion County Health Department from June of 2006 through July of 2006.  (R. 240-246.)  Upon physical examination, the records revealed that Plaintiff's lungs were clear, her joints were grossly normal and that she was overweight.  (R. 242.) Plaintiff was diagnosed with arthritis, chronic back pain, hypertension, obesity, edema and asthma.  In July of 2006, Plaintiff was diagnosed with diabetes and hyperlipidemia.  (R. 240.)

On June 6, 2006, Plaintiff was treated at Ocala Regional Medical Center for left knee pain.  (R. 264-266.)  An x-ray of the knee showed no acute bony abnormality.

Plaintiff underwent a re-employment assessment with Gerri Pennachio, a disability  management specialist.  (R. 134-152.)  During that assessment, Plaintiff described her physical capabilities.  (R. 141-142.)  Plaintiff reported a sharp, stabbing pain in her low back with tingling radiating down her right leg.  (R. 141.)  On a scale from 0 to 10, Plaintiff rated her pain ranging from a 5 to 10+.  Plaintiff described an occasional numbness in her right and left arm; no reaching limitations; she can lift an 8 pound gallon of milk; she can sit 30 minutes at the time; she must use a cane to walk; she cannot bend, twist, kneel, stoop or squat; she avoids climbing; and she has no limitations on balancing.  (R. 142.)  Plaintiff's described her daily activities as being moderately independent with bathing, personal hygiene and dressing needs; she can cook occasionally; wash dishes; do laundry; run errands; attend church on Sundays;

and drives to take her mother to her doctor appointments.  Ms. Pennachio opined that Plaintiff was disabled.[22]  (R. 147-148.)

Plaintiff testified on her own behalf at the administrative hearing.  (R. 267-294.) Plaintiff testified that she was 47 years old at the time of the hearing.  (R. 274.)  Plaintiff stated that she stopped a weight loss program when worker's compensation stopped paying for it.  Plaintiff testified that she weighed approximately 340 pounds.  (R. 275.) Plaintiff stated that the pain gets bad and she is unable to walk like she used to.  (R. 276.)  Plaintiff described that she used a cane to prevent her from falling and to take the pressure off of her right side.  Plaintiff reported that she does not have any problems with the use of her hands, fingers or using her fine dexterity skills.  Plaintiff stated that she has a driver's license, but does not like to drive but will do so if her mother gets sick.  (R. 277.)  Plaintiff was driven to the administrative hearing by her mother.  (R. 288.)   Plaintiff wore a brace on her right knee.  (R. 279.)  Plaintiff stated that her pain is worse in the back and radiates down her right leg, she described her pain level as a 10 on an average day.  (R. 282.)  Plaintiff is able to sleep approximately six and a half hours per night.  (R. 284.)  Plaintiff stated that she spends half of her day lying down on the couch (R. 284) and also used a recliner to stretch her legs.  (R. 285.)  Plaintiff reads her Bible and watches television.  Plaintiff stated that she has trouble bathing and dressing herself and requires help.  Plaintiff can sit for 30 to 40 minutes before having to change positions.  Plaintiff stated that she is unable to stand on her own, unless she is

---

[22]  The ALJ accorded little weight to the September 2006 opinion of Gerri Pennachio.  (R. 24-26.) The ALJ found that this opinion was based on Plaintiff's subjective complaints and noted that Ms. Pennachio was not a medical expert.  (R. 25-26.)  Plaintiff does not raise this issue on appeal.

propped on something, such as her cane, which would allow her to stand 30 to 40 minutes.  (R. 286.)  Plaintiff testified that she could walk a quarter of a block.  (R. 287.) Plaintiff reports that she is able to lift a gallon of milk but has difficulty bending over at the waist and has a device to help her pick items up.  (R. 287-88.)

The ALJ determined that Plaintiff suffers from degenerative disc disease of the lumbar spine and morbid obesity.  (R. 21.)  The ALJ determined that while these impairments are severe Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4.   (R. 20-21.)

Based upon those limitations, the ALJ determined that Plaintiff retains the RFC to stand, walk and sit six hours in an eight-hour work day and lift twenty pounds. Plaintiff has occasional postural limitations in climbing, balancing, stooping, kneeling, crouching, and crawling.  (R. 21.)   Plaintiff should avoid fumes, odors, dusts, gases and poor ventilation, avoid unprotected heights and avoid moving machinery.

The ALJ then determined that although Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, she did not find Plaintiff's statements concerning the intensity, duration and limiting effects of these symptoms entirely credible.  (R. 25.)  The ALJ determined that Plaintiff was able to perform her past relevant work and, therefore, concluded that Plaintiff was not disabled at any time through the date of the ALJ's decision.[23]  (R. 26.)

_____

[23]  To be eligible for disability insurance benefits under Title II of the Social Security Act, Plaintiff must establish that her disability began before her insured status expired.  42 U.S.C. § 423(a) and (c), 20 C.F.R. § 404.101, § 404.130, § 404.131; Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002).  The record demonstrates that Plaintiff's insured status expired on September 30, 2006.  (R. 67).

(continued...)

## IV. **DISCUSSION**

Plaintiff raises a number of arguments on appeal, which can be divided into four arguments. First, Plaintiff argues that the ALJ erred by rejecting the opinion of Plaintiff's treating physician, Dr. M. Allam Reheem.  Second, the Plaintiff contends that the ALJ violated the Eleventh Circuit pain standard by rejecting Plaintiff's credibility with no evidentiary basis for doing so.  Third, Plaintiff claims that the ALJ failed to call a vocational expert. Lastly, Plaintiff argues that the ALJ failed to include a proper analysis of Plaintiff's obesity pursuant to Social Security Ruling 02-1p.

### A.  The ALJ Properly Evaluated the Opinion of Plaintiffs' Treating Physician

Plaintiff's first argument on appeal is that the ALJ erred by rejecting the opinion of Plaintiff's treating physician, Dr. Reheem.  Dr. Reheem opined that Plaintiff was unable to work and that she was limited in walking, sitting and all other activities. (R. 262-263.) The ALJ weighed the opinions of the treating physicians (all of whom were specialists and all of whom treated Plaintiff during the relevant time frame) and decided to accord greater weight to the opinion of Plaintiff's neurologists, Dr. Kaplan and Dr. Inga, as opposed to the opinion of Plaintiff's pain specialist, Dr. Reheem.  (R. 25-26.)

In declining to accord Dr. Reheem the same weight as the other treating physicians, the ALJ stated that "Dr. Reheem's latest opinion is not supported by his own progress notes nor the opinions of the neurosurgeons, Dr. Kaplan and Dr. Inga. Therefore, the undersigned adopts these opinions which [are] consistent with the state agency evaluations."  (R. 25.)  Dr. Kaplan and Dr. Inga, opined that Plaintiff could return

---

[23](...continued)
Consequently, Plaintiff must establish disability prior to that date.

to work with restrictions of not lifting over 20 pounds and that Plaintiff should avoid repetitive bending and stooping. (R. 165, 232.)

It is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[24] If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[25] Upon a review of the ALJ's decision, as well as an examination of the medical records at issue, the Court finds that the ALJ properly considered the opinion of Dr. Reheem as a treating physician. The ALJ articulated good cause for discounting Dr. Reheem's assessments regarding Plaintiff's functional limitations.

This is not a case where an ALJ rejected the opinion of a treating physician and instead accorded greater weight to a non-examining physician. Rather, the ALJ gave less weight to the opinion of Dr. Reheem and accorded greater weight to the medical opinions of three of Plaintiff's treating physicians – all of whom are specialists and all of whom treated Plaintiff during the relevant time frame.

---

[24] Crawford v. Comm'r of Soc. Sec., 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records."). *See also* Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Comm'r of Soc. Sec., 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[25] 20 C.F.R. § 404.1527(d)(2).

A review of Dr. Reheem's progress notes provides good cause for the ALJ' decision to accorded less weight to his opinion of the extent of Plaintiff's limitations. Dr. Reheem treated the Plaintiff from October 23, 2002 to August 9, 2006. In contrast to Dr. Reheem's opinion that Plaintiff was unable to work, Dr. Reheem's treatment notes disclose that Plaintiff was treated conservatively with medication and epidural injections. (R. 202-213, 216-217, 222, 223, 225, 248, 251-252, 254-256, 261.)  Additionally, Dr. Reheem's progress notes reveal that Dr. Reheem determined that Plaintiff was "functional" (R. 202-207, 213, 216-218, 222) and that her medication reasonably controlled her pain. (R. 202-213, 216-217, 222, 223, 225, 248, 251-252, 254-256, 261.) Furthermore, the only abnormality noted by Dr. Reheem upon physical examination was that Plaintiff was obese and had decreased range of motion in the lumbar spine. (R. 208-216, 221, 224, 226, 247-248, 251, 254-256, 259.)  Additionally, the treatment records reveal that Plaintiff had no motor strength weakness in her extremities and no sensory deficits. (R. 226.) Neurologically, there were no motor, reflex, or sensory abnormalities. (R. 169.)  Moreover, Plaintiff had full range of motion of her cervical spine and her grip strength and fine manipulation was normal. (R. 175.)  Although Plaintiff complained of knee pain, an x-ray of the knee showed no acute bony abnormality.  (R. 264-266.)

In rejecting the opinion of Dr. Reheem, the ALJ adopted the opinions of Dr. Kaplan and Dr. Inga. Plaintiff was treated by Dr. Kaplan from June 28, 2002 to February 4, 2003. (R. 165-170.)  Over the course of her treatment, Dr. Kaplan reviewed the results of an MRI of the lumbar spine and opined that based upon Plaintiff's current condition, he was not certain that Plaintiff needed surgery. (R. 165,169.)  Additionally, Dr. Kaplan noted that Plaintiff "still has not started a weight loss program and [he] could not be of

any service to her until she does." (R. 165.) In February of 2003, opined that Plaintiff was limited to lifting objects greater than 20 pounds or from prolonged bending or stooping.

Plaintiff was treated by Dr. Inga from July 27, 2004 through February 10, 2006. (R. 228-239.) During this period of time, Dr. Inga reviewed the results of two MRI scans of the lumbar spine and concluded that Plaintiff should continue conservative treatment. (R. 228, 231.) Dr. Inga opined that Plaintiff was capable of returning to work with restrictions of no lifting greater than 20 pounds and she should avoid repetitive pushing, pulling, bending or lifting. (R. 228-229.)

Consistent with this medical evidence, the two state agency physicians opined that Plaintiff could lift 20 pounds, sit, stand and walk six hours in an eight hour workday, occasionally climb, balance, stoop, kneel, crouch, and crawl, and should avoid fumes, odors, dusts, gases, and poor ventilation, as well as work at unprotected heights and around moving machinery. (R. 176-183, 194-201.)

In evaluating Plaintiff's RFC the ALJ gave significant weight to the opinions of Dr. Kaplan and Dr. Inga in concluding that Plaintiff could return to work with the restrictions of no lifting over 20 ponds and no repetitive bending and stooping. Where, as here, an ALJ decides to give more weight to the opinion of one treating physician over the opinion of another and the decision is based upon substantial evidence of record, it is not the role of this Court to re-weigh the evidence or to substitute its discretion for that of the ALJ.[26] Accordingly, there was no error by the ALJ in adopting the opinions of Drs. Kaplan and Inga over the opinion of Dr. Reheem.

---

[26] Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996.)

**B. The ALJ Properly Evaluated Plaintiff's Pain and Credibility**

Plaintiff next argues that the ALJ violated the Eleventh Circuit pain standard by improperly rejecting Plaintiff's credibility with no evidentiary basis for doing so.

The law on this issue is straightforward. If an ALJ decides not to credit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[27] While an adequate credibility finding need not cite "particular phrases or formulations [...] broad findings that a claimant lacked credibility and could return to her past work alone are not enough to enable a court to conclude that the ALJ considered her medical condition as a whole."[28] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[29] However, a lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.[30] If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a

---

[27] Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Jones v. Dep't of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[28] Foote, 67 F.3d at 1562-1563.

[29] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[30] Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).

24

specific credibility finding."[31]  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.[32]

In the instant case, the ALJ applied the Eleventh Circuit's pain standard "threshold"[33] assessment to Plaintiff's subjective complaints by noting that Plaintiff had the impairment of degenerative disc disease of the lumbar spine.  While the ALJ did not cite the exact language of the standard, he did state that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. 404.1529 and 416.929 and SSRs 96-4p and 96-7p."  (R. 24.)  This language, a paraphrase of the pain standard, along with the supporting findings, shows that the ALJ applied the pain standard.  Moreover, the ALJ cited 20 C.F.R. § 404.1529, which contains the same language regarding subjective testimony that the Eleventh Circuit interpreted when initially establishing the pain standard.[34]

In applying the pain standard, the ALJ found that Plaintiff met the initial burden of showing underlying medical conditions of degenerative disc disease of the lumbar spine and morbid obesity that could reasonably be expected to produce the alleged symptoms but that the Plaintiff's statements concerning the "intensity, persistence and limiting effects of these symptoms are not entirely credible."  (R. 25.)

---

[31] Foote, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (holding that although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

[32] Foote, 67 F.3d at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

[33] Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).

[34] Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002).

The ALJ discussed a number of reasons for rejecting Plaintiff's allegations of disabling pain, each of which is supported by competent substantial evidence. First, the ALJ noted that Plaintiff lives a "fully functional lifestyle which is consistent with the medical evidence." (R. 26.) Plaintiff is able to care for her personal needs (R. 122) and is able to cook, drive her mother to her appointments and drive herself to her own appointments. (R. 142.) Further, the ALJ noted that Plaintiff can do laundry, run errands and attend church on Sundays.

Second, the ALJ noted that the clinical findings resulting from these impairments do not appear to be producing pain or limitations of incapacitating proportions. (R. 26.) The ALJ found and the record supports, that Plaintiff's allegations and symptoms are beyond what could be expected considering the clinical and objective findings. Overall, the record revealed no significant neurological deficits indicative of a debilitating physical impairment. (R. 169, 173-174, 185, 191, 202, 228, 231, 236-238, 242.) Although the MRI scans of the lumbar spine showed some evidence of degeneration and disc bulging at L4-5 and L5-S1, there was no evidence of any compromise of the neural structure. (R. 170, 231.) Additionally, Dr. Kaplan found from a neurological perspective that there were no motor, reflex or sensory abnormalities. (R. 169.) An examination of the knees revealed no obvious deformities and Plaintiff on examination exhibited good range of motion with no crepitus bilaterally. (R. 185.) Further, while an x-ray of both knees revealed some degenerative changes there was nothing acute that was observed.

Moreover, a motor system evaluation conducted by Dr. Inga revealed good strength tone in all four extremities and there was no evidence of deficits upon sensory examination. (R. 236-237.) Although Dr. Inga diagnosed degenerative small right

posterolateral protrusion at L4-5 and degenerative bulging at L5-S1, Dr. Inga concluded that the neurological examination failed to disclose evidence of a focal neurological deficit and specifically there was no evidence of radiculopathy or myleopathy. (R. 237-238.) The only abnormality noted by Dr. Reheem upon repeat physical examinations was that Plaintiff was obese and had decreased range of motion in the lumbar spine. (R. 208-216, 221, 224, 226, 247-248, 251, 254-256, 259.) A physical examination conducted on June 16, 2006, determined that Plaintiff's joints were grossly normal. (R. 242.)

Lastly, the ALJ noted that Plaintiff's medications relieve her pain. In fact, there are numerous treatment records documenting that Plaintiff's pain was reasonably controlled with medications. (R. 202-213, 216-217, 222, 223, 225, 248, 251-252, 254-256) and that she suffered no significant side effects from the medications. (R. 212.)

For these reasons, the Court concludes that the ALJ thoroughly discussed the medical evidence and articulated specific and adequate reasons for deciding to discredit Plaintiff's subjective complaints regarding the "intensity, persistence and limiting effects of her symptoms." Where, as here, the ALJ has made a thorough and well supported credibility determination it is not the role of this Court to re-weigh the evidence or to substitute its discretion for that of the ALJ.[35]

## C. The ALJ Did Not Err in Determining That Plaintiff Could Perform Her Past Relevant Work

Plaintiff contends that the ALJ erred by failing to obtain the testimony from a vocational expert in finding the Plaintiff has the RFC to perform her past relevant work.

---

[35] Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996).

This argument misconstrues the relevant law with regard to the analysis at step four. While the testimony of a vocational expert is often relevant at step five of the sequential analysis—after the burden has shifted to the Commissioner to prove that there are jobs that exist in significant numbers in the national economy that an individual with Plaintiff's RFC could perform—there is no requirement for an ALJ to use VE testimony to determine whether a claimant can perform her past relevant work at step four of the sequential evaluation process.[36] The regulations provide that "the services of a vocational expert" *may* be used in making this determination.[37] And although the decision whether to use a vocational expert at step four of the sequential analysis is left to the ALJ's discretion,[38] the ALJ should not elicit VE testimony concerning the discrete issue of whether Plaintiff is, in fact, capable of performing her past relevant work.[39]

Accordingly, the ALJ did not err by failing to use a VE at step four in determining that Plaintiff could perform her past relevant work.

---

[36] Hennes v. Comm'r of Soc. Sec. Admin., 130 Fed. Appx. 343, (11th Cir. 2005) (quoting 20 C.F.R. § 404.1560(b)(2)); *see also* Walker v. Comm'r of Soc. Sec., No. 6:07-cv-1647-Orl-18KRS, 2008 WL 5100120, at *6 (M.D. Fla. Dec. 2, 2008).

[37] 20 C.F.R. § 416.960(b)(2).

[38] *See* 20 C.F.R. § 416.960(b)(2); *see also* SSR 00-4p.

[39] The testimony of a vocational expert at step four should not address the Plaintiff specifically, but rather, should be limited to rendering an opinion concerning the physical and mental demands of Plaintiff's past relevant work, and responding to hypothetical questions about whether an individual with Plaintiff's RFC would be capable of performing Plaintiff's past relevant work. *See* 20 C.F.R. § 416.960(b)(2); *see also* SSR 00-4p.

### D. The ALJ Properly Analyzed Plaintiff's Obesity Under Social Security Ruling 02-1p

Finally, Plaintiff contends that the ALJ failed to properly analyze her obesity with respect to Social Security Ruling ("SSR") 02-1p.[40] Pursuant to SSR 02-1p, the ALJ must consider a Plaintiff's obesity in making a number of determinations, including whether the individual has a medically determinable impairment, the severity of the impairment, whether the impairment meets or equals the requirements of a listed impairment, and whether the impairment prevents the Plaintiff from performing her past relevant work or other work in the national economy.[41] When assessing a Plaintiff's RFC, the ALJ is supposed to consider the effect "obesity has upon Plaintiff's ability to perform routine movement and necessary physical activity within the work environment" as the "combined effects of obesity with other impairments may be greater than might be expected without obesity."[42]

While the ALJ did not expressly cite SSR 02-1p in his decision, his treatment of Plaintiff's obesity comported fully with the ruling as to all steps of the sequential evaluation process. In particular, the ALJ expressly included obesity in listing Plaintiff's severe impairments at step two of the sequential analysis. He then found at step three that Plaintiff's obesity did not meet or medically equal an impairment listed in 20 C.F.R., Subpart P, Appendix 1, Regulations No. 4. (R. 21.) The ALJ then thoroughly discussed and explained the evidence bearing upon Plaintiff's RFC, including Plaintiff's obesity. The

---

[40] *See* SSR 02-1p.

[41] *See* Id.

[42] *See* Id.

record is replete with medical evidence that despite Plaintiff's obesity, physical examinations revealed no objective abnormalities of the level of severity alleged to interfere with her ability to work.

As SSR 02-1p makes clear, it is not the mere presence of an impairment such as obesity which determines disability, but rather the effect the impairment has on the ability of the Plaintiff to function and perform work related tasks. In her one sentence argument, Plaintiff fails to demonstrate or even mention how her obesity affects her ability to perform work dictated by her RFC. Nor does she point to evidence of any functional limitations related to her obesity that were not considered by the ALJ in reaching the RFC determination.[43] Accordingly, the Court concludes that the ALJ did not err and that she fully satisfied the requirement that she evaluate Plaintiff's obesity pursuant to SSR 02-1p.

## V. CONCLUSION

In view of the foregoing the decision of the Commissioner is due to **AFFIRMED** and the Clerk is directed to enter judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, March 20, 2009.

GARY R. JONES
United States Magistrate Judge

Copies to:

All Counsel

---

[43] Indeed, Plaintiff's argument has little merit in view of the fact that the Plaintiff has suffered from obesity for many years and that she worked for years before she injured her back, as well as even after she injured her back, despite the fact that she was obese.